Good morning, Your Honor. May it please the Court, Neil Strenson for the petitioners, Mohamed Mermehdi and Mohsen Mermehdi. Your Honors, it's important for the Court to realize that the government continues to have the power and the authority, and we believe the intent, to remove our clients from the United States. Before you get started, I want to thank Judge David Ezra from the District of Hawaii. He went to the same high school that one of our presidential candidates went to. And why he'd want to leave Hawaii to come to Pasadena, I don't know. We're happy to have him here and welcome him, and I hope he works a way for me to get back to Hawaii. Thank you. He'll do that, I believe. Thank you. Welcome, Your Honor. I was expecting to see Judge Smith here, so I was a little bit surprised to see a different face here this morning. Hawaii or Idaho are very, very close in many ways. But as I was saying, Your Honor, Your Honors, the government has demonstrated its intent and its desire to remove the both petitioners from the United States. They are both subject to very stringent reporting requirements. They are still required to report to the Department of Homeland Security every other month. They are subject to geographic restrictions in their movement in the United States. At the present time, they are not allowed to leave the State of California. They can be taken into custody at any time pursuant to the withholding, even though the Immigration Court and the Board of Immigration Appeals has granted withholding of removal to them. The issue before the Court is whether or not the Board of Immigration Appeals denied its – abused its discretion in denying the discretionary relief of asylum to the petitioners. There are several positive factors that the Board of Immigration Appeals failed to give adequate weight to. This Court has clearly held repeatedly in Kabuli and other cases that the Board of Immigration in the record as well as to give adequate consideration to the favorable factors in the record. Well, they did get some relief, didn't they? As I was saying, Your Honor, both petitioners have been granted withholding of removal, but that only prohibits Department of Homeland Security. And protection against. And withholding of removal pursuant to the Immigration and Nationality Act and withholding of removal pursuant to the Convention against Torture. Torture, yes. The two forms of relief under the Convention against Torture and the withholding statute, the non-refoulement provisions of the Immigration Act, are identical in nature. They are country-specific forms of relief. Homeland Security cannot execute their removal to Iran, but Homeland Security can execute their removal to a third country. In most cases where the Immigration Court grants withholding of relief, withholding of removal, Homeland Security does not make efforts to execute removal to a third country. That is not the case with the petitioners. And that is why we think the Board should have given significant consideration to the fact that they can be removed to a third country and that they face danger even in third countries. We're fearful. Where is it that you're concerned that they are about to be removed to? Frankly, we believe the two countries that are contiguous to Iran would be likely candidates. Well, I mean, you say that you know that they're going to do, have any, has any definitive step been taken to remove them? That is not something that we are given any information on. So, but I'm, where I'm coming from is I'm trying to figure out how you know this. Did somebody tell you that they are in the process of removing your clients or as soon as this is done, they're going to send them off to a third country? Department of Homeland Security has spoken to the media. This is something that is in our motion to stay. The court did grant a provisional motion to stay their removal from the United States. Department of Homeland Security made statements to the media that we included in our motion, in support of our motion to stay, indicating that they were actively seeking a third country. Additionally, as I was saying, due to the ongoing, three years since they've been released from custody, due to the ongoing requirements the Department of Homeland Security has imposed on their restrictions on their liberty, requiring them to report here in Los Angeles to the Downtown Immigration and Customs Enforcement Office every other month, prohibiting their travel outside of the state of California. Homeland Security is keeping both petitioners on a very tight leash, and we have no reason, the reasonable conclusion, I should say, that one should draw from that is that Homeland Security still has the intent to take them into custody. You're going to draw an intent from the Department of Homeland Security. How do you do that? In most cases, Your Honor, where the government, where an immigration judge grants withholding of removal to a respondent in immigration court removal proceedings, that's the end of the matter. They're released. They go on about their life. And even though they do not have the ability to immigrate and become a naturalized citizen, they are, for all practical purposes, here for the rest of their life. They are not subjected to these intensive monitoring provisions. When the Board of Immigration Appeals granted, upheld the granting of convention against torture and withholding protection to the petitioners, they were not released from custody, as is normally the case. They were kept in custody for another seven months. That is not something that happens in regular, in routine cases, where the government does not have intentions to execute removal to a third country. We concede it's … But they're out now. They are now, yes. And the requirement is that every other month they get a report to the authorities in downtown L.A.? Yes, Your Honor. Now they have two other. There are four of them, aren't there? There are four brothers in total, correct. And the other two brothers, where are they? All brothers are here in Los Angeles and subject to the same reporting requirements. All four? All four. And what were they doing before all this? They were living in the United States. All of them were illegally present in the United States. They were working at various jobs. The two petitioners before the court were both involved in real estate. They were paying taxes, as the record indicates, for both petitioners. They were living, albeit illegally present in the United States, they were living otherwise upstanding lives in the United States. They were caught up in a nightmare. They made some stupid mistakes. There are certainly negative discretionary factors in the record. Fraudulent asylum applications were filed on their behalf, but they did not, and we believe the board is wrong in this, wrong to fail to consider the mitigating circumstances under which the fraudulent asylum applications were filed. And where is the attorney? I think his name was Taba. Taba. Taba Tabai. Taba Tabai. I do not know where he is presently. He was in prison. He was convicted of filing fraudulent asylum applications. I believe he was also convicted of providing material support to a designated foreign terrorist organization, specifically the Mujahideen-e-Khalq. And that, again, was one of the reasons our clients have received the level of attention from Homeland Security. I was going to say, doesn't that explain a little bit about why they're keeping your clients on a short leash, is that they were involved with knowingly participating in a fraudulent visa application process, and then, to boot, the guy they were involved in was apparently, or at least allegedly involved with helping to fund terrorism? Well, that explains. I mean, that might explain it, wouldn't you think? I would agree, Your Honor. It certainly explains the initial interest. But two separate immigration judges and the Board of Immigration Appeals have cleared both of the petitioners in this matter from any involvement in support for the M.E.K. If there was still some doubt, some evidence in the record, to suggest that our clients were involved in providing material support to a designated terrorist organization, that would have barred their eligibility for withholding of removal. Well, you know, I'm not unsympathetic to their concern, but I think that the bottom line is that once you're kind of tagged with that moniker, whether it be fairly or unfairly, and maybe this is since 9-11 and the fact that the State Department and others were not as careful about keeping tabs on people that later turned out to be not so wonderful, I mean, I can understand where they would err on the side of caution. I fully agree with Your Honor, and we have an extensive record in this case, a large record for immigration matters, the record's in excess of 4,000 pages. The FBI has testified in these matters. Bottom line, that explains the initial interest of the Department of Homeland Security and our clients, but in the end, two separate immigration judges and a board of immigration appeals which is not sympathetic to our clients cleared them and found that there was no evidence in the record to support any involvement in terms of material support to a designated foreign terrorist organization. That should be the end of it, and the board should not be affording any weight to that matter. My time has expired. Thank you. Thank you. Thanks. Good morning. May it please the Court, my name is Paul Stone. I'm with the Department of Justice, and I represent the Respondent. Whether the Mermetti brothers should be removed to Iran is not an issue. They won't be. They were granted withholding and removal and protection under the Torture Convention. What is at issue is the board's denial of asylum. When the board denied them asylum because the Mermetti's perpetuated a serious fraud in their applications for the very benefit they're now seeking. Because asylum leads to a green card and eventually citizenship, this is tantamount to lying to obtain naturalization. As a result, the board weighed this factor heavily in denying their application for asylum as a matter of discretion. In doing so, the board did weigh all the appropriate factors in this case. It balanced the seriousness of their asylum fraud with the perpetuation of the fraudulent documents they used to enter the United States against the significance of their personal ties in the United States and the threat of persecution in light of their having been granted withholding, removal, and cap protection. You know, you have to speak a little slower. I'm sorry, Your Honor. It's okay. Just calm down. Because, you know, the words just come out fast. You'd probably be a good anchorman for television, though. It's all fast. I know they seem to be saying less and less on the news there, Your Honor. Well, they get a lot out in 15 seconds. Okay. Let me back up a bit and talk again about what the board did in balancing. What the board did was it balanced the significance of their personal ties here in the United States. It noted that neither of them had any family that were here illegally. In other cases where personal ties have been important, the families have had lawful permanent resident relatives or citizen relatives. It also balanced the threat of persecution against them. Now, while it's clear that they have a high level of likelihood of being persecuted if they return to Iran, the board noted they had both been granted withholding, removal, and cap protection, meaning the likelihood of persecution in Iran doesn't exist. And then balanced that against the seriousness of their asylum fraud, which is, again, the benefit they're seeking here, along with the perpetuation of the fraudulent documents they used to enter the United States. Now, typically, entering the United States with fraudulent documents is not a strong discretionary factor against granting asylum because it's often necessary to escape the threat of persecution. The difference here is they perpetuated that fraud. Yeah, a lot of people filed false asylum claims. It's almost a cottage industry. Yeah, unfortunately it is, Your Honor. Yeah. It's true. And here, fortunately, they were able to identify it and stop it before it happened. The great irony of it is because they were stopped from pursuing these asylum applications further, the presence was publicized as well as the membership, the purported membership in the MEK NCR. As a result, that actually is what gave rise to what has now given them withholding, removal, and cap protection. So it's not even clear what happened. Do we have any other cases where an alien has been granted suspension, suspension of deportation, and conditions are imposed, like reporting to Homeland Security or the INS every other month? I'm not aware of this Court considering any cases like that. It would not surprise me if the DHS has done that in other cases where an alien is denied asylum or granted withholding and cap protection, if there are reasons for that. And here, the concern is— We've never had one. We've never had one like that. Well, fortunately, Your Honor, that's actually not an issue in this case. It's an issue that is solely a question of asylum. The statutes, the INA does grant the government the right to impose certain restrictions on reporting to an alien who has been released, who are suspected of having terrorist ties. But as I said, fortunately, that's not an issue. Well, your opponent suggests that, as a matter of fact, the record displays that they have no terrorist ties at all, but that they are, in effect, being painted with the same broad brush, and that's the reason why DOJ or Homeland Security is chasing after them so vigorously and attempting to single them out for particularly harsh treatment. What is your response to that? Well, that's actually not the case. What the Board did in this case was it found that they were not precluded from withholding a cap because they were not a threat to the national security. And that's a specialized inquiry asking, essentially, whether they have engaged in terrorist activity in the United States, I mean, fundraising or other more obvious activities. So, in effect, they did get a substantial benefit, but they're being denied, from your perspective, the benefit of asylum because of the overriding fraud which they participated in knowingly. Yeah, that's correct, Your Honor. But I do want to point out that the Board didn't reach a lesser threshold. For example, a bar to asylum is membership in a terrorist organization. The Board didn't decide that issue. So, yes, they've been exonerated of committing terrorist activities, but lesser involvement in terrorist organizations hasn't been reached in this case. What was reached? The lesser involvement? Lesser involvement than actually committing terrorist activities. What was the lesser involvement? Here, it appears that they are members of the MEK and the NCR. They participated in various demonstrations. Their names appeared on the list in the MEK headquarters. There was testimony from a witness. What demonstrations? You know, this is kind of interesting. People and other citizens on the back like to know what our country's doing. Well, there's obviously, you know, joining demonstrations is protected speech. The only point of that is what that says about membership and other participation in other activities. You know, there was also testimony from an FBI agent that they had gone to meetings. But none of these, the Board found that none of these things rose to the higher level of actually engaging in terrorist activities. But, again, fortunately, that's not an issue here. It's the narrow issue of whether the Board of Views gets discretion in denying asylum. In this case, both applicants admittedly. Let me ask you this. Say that a year from now, two years from now, Homeland Security decides that they want to send these brothers to Persia. Will they have an opportunity to contest that decision? Well, if by Persia, you mean Iran, the government can't send them to Iran because they've been granted cap protection withholding removal. What they're concerned about is that the government will remove them to another third country. Somewhere like Iraq? That's what they're suggesting, Your Honor. I'm not sure how that would happen. The government decides that they'd like to send them to Iraq. They give them notice of that, I presume. I'm not sure how the actual notice works on that. Come in the middle of the night and grab them. But there's a number of things that are required for that. First, the government of Iraq has to be willing to accept them, which is often very difficult in any case regardless of the underlying facts. And here it's complicated by the publicity surrounding this arrest showing that they may be members of the NEK. So governments are less likely to accept them. That's not to say that the government will try to remove them. Would they be entitled to some sort of a hearing or something before they got removed? Or would they just be, let's assume that what's been done is affirmed, would the government be in a position to just go pick them up and put them on an airplane and goodbye? I don't know if that's the case, Your Honor. They can certainly attempt to apply for withholding from the country that they'd be potentially removed to. That's what I was asking. Wouldn't they be in a position to say, well, wait a minute, I can't go there because I'm likely to be subjected to torture or some other terrible treatment there because the particular sect that doesn't like me is there in even greater numbers or in equal numbers or something of that kind? Well, that's what they did attempt to do here. Again, it's not an issue before this court. Well, they did it here with respect to Iran. But I'm talking about if, for instance, the government attempted to move them to Iraq and let's say they have a problem with the Sunnis or they have a problem with the Shiites, they'd be able to say, wait a minute, they're waiting for me. If we get over there, we're finished. Would they be able to raise that issue? I can't say for certain, Your Honor, since it wasn't an issue here. It's not something I've looked into. I can prepare something for the court, write a letter explaining what could happen. As a practical matter, removing them from the country in the foreseeable future is not going to happen. Well, I can't say it's not going to happen. But another point is removing them will also require them to have travel documents. They'll need to have passports, which they'll have to be involved in. So there will be some notice. They had moved to reopen in front of the board, arguing that their proceedings should be reopened to seek withholding from Iraq and I can't remember the other country. But the board had said it was premature because there was no indication that they were actually going to be removed. Well, look, you have two former district court judges and one active district court judge here. We're used to getting calls in the old days from injunctions where they're at the airport, ready to get on the plane. That kind of thing is not, I think, what Judge Pregger said. That's not what's in the cards here. There would have to be a lot more going on here before they'd be able to be deported. That is correct, Your Honor. And as far as the phone call before them getting on the plane, I'm aware this court does have a number for after-hours phone calls for aliens seeking emergency stays. The problem has always been getting another country to accept them. We have a lot of these people who are paroled into this country, whether they're from a merry old public or whether they're from a family. That's very true, Your Honor. I'm sorry. I didn't realize the time is now counting up. I'm actually quite over. I apologize. It's okay. Your Honor, my time is expired. May I have a short reply? About 30 seconds. You've got nothing to worry about. He just said that. I would like to address that. There is no provision for a new removal hearing if the government takes our clients into custody, which is why we did attempt to do a motion to reopen the proceedings based upon our concern of possible removal to Iraq or Afghanistan.  Immigration courts and the Board of Immigration Appeals are not, under their rules, open 24 hours a day, seven days a week, as the district courts are. There is no emergency number. The filing of a motion to reopen an immigration court does not automatically stay anything. The board would have to enter a separate order. And while they do have a fax process for that, it's something that works nine to five during normal business hours. So with that, I'll conclude, Your Honor. Do you want the Immigration Service to work 24-7? They do work. That would be good for your clients. They do work. It's only certain offices work 24-7. Other offices do not work 24-7. All right. Well, we have the facts well in hand, and we'll take the matter under submission. Thank you. Thank you very much. All right. Let's see. Now we come to Ward versus San Diego Unified Court District. And then we have Pierce versus San Diego Unified Court District. And Mr. Garrison, you're on both of those cases. And Mr. McMinn.
judges: Pregerson, Hall, Ezra